Islamic Republic of Iran Islamic Republic of Iran Rubin v. Right. I know what Gates said on this point, but that issue was not litigated or briefed in the case. And the court didn't grapple with the, as provided in this section, language in the 1610 G or even address the question about whether it incorporates the requirements of 1610 A and B by virtue of that language. It just wasn't in the case. And this was an alternative grounds for the judgment in Gates. And perhaps... I think it was a justification for the decision. It was one of two justifications. There's no question about that. But the issue in that case was essentially lean priority as between two terrorist victims, sets of terrorist victims, who were claimants against Syria, seeking the same bank account assets. Right. And so there wasn't... I mean, whether this was commercial property and met the requirements of A and B, A or B, of 1610, just wasn't in the case. And the relationship of subsection G to A and B wasn't in the case either. It would have been. I mean, if you look at it from the other side, let's say if 16... Granted, 1610 C does not incorporate explicitly 1610 G, but 1610 G says, as provided in this section, how do you distinguish among the various provisions of this section and say, well, it applies to A and B, but it doesn't apply to C, it'll apply to D, but not E and F? There are lots of anomalies with subsection G, and each side's interpretation produces its own bad sets of anomalies. And that just suggests that it's ambiguous and we should construe it in context. I agree. I think 1610 G is ambiguous. And I think that the various, numerous judicial interpretations of the statute, I think it's ambiguous. Well, I don't know that I think numerous is overstated. We have a handful. I mean, Heisler, Peterson, Gates, and I think there's... One Court of Appeals decision. I'm sorry? A handful of district courts, one Court of Appeals decision that really wasn't addressed to the specific question of statutory interpretation. Peterson was the ninth circuit. I'm sorry. Okay. The question, again, will be how to read. Let's say that what's going to be the reading? It's a rhetorical question. I'm not asking Your Honor to answer. The rhetorical question, just to illustrate, is how do you read the ads provided in this section to apply only to A and B without incorporating everything else? And how do you have a reasoned distinction between why it should apply to A and B and not to C? And I think to maintain consistency with the Gates decision, the court has to find that ads provided in the section is just buried, and that's why the courts haven't addressed it. Speaking of buried, you didn't really discuss this in your opening brief. You came back at Gates in your reply brief. Right. Gates I raised in response to the Appellees' discussed Gates, and I brought it up again there. Well, it's sort of more, I think, appropriately characterized as drive-by citations of Gates without really grappling with what Gates has to say as a substantive matter. Right. It was issued very shortly before I filed before, and I missed it. Okay. It's here now. You want it read for all it's worth, basically. I'm sorry? You want the case read for all it's worth. I do. Yes. Yeah. Yes. Okay. Maybe move on to your commercial activity argument. Yes. Let me discuss that. Commercial activity, again, 1610A, it's not ambiguous. It says that the property of a, let me read it. It says the property in the United States of a foreign state that is used for a commercial activity in the United States shall not be immune from attachment under specified circumstances. When it says used for a commercial activity, by reading that, it does not imply that any particular party used it. Now, Iran cites Strunk and White for the proposition that when you use a passive voice it's ambiguous. And I think besides the fact that Strunk and White doesn't have a place when the Supreme Court has said that this kind of passive voice means that it's open and it doesn't matter who performed the act, but I think also Strunk and White were teaching people how to write. They weren't teaching people how to read. And when you're writing a statute and if you have a particular actor in mind, you say used by the foreign state for a commercial purpose. If you're reading a statute that's written by people who presumably have it on their shelf. It doesn't tell us used by whom. That's the question. The passive voice leaves that question open. Which under Supreme Court authority means that any use. The focus is not on the subject, who uses, but on the fact of use. That would be a major expansion of the commercial activity attachment exception, well beyond the scope of the commercial activity jurisdictional immunity exception. So I'm glad your Honor asked that question because there is a general observation that jurisdictional immunity is, the exceptions to jurisdictional immunity are broader than the exceptions to attachment immunity. But that's not a rule. The appellees are citing that observation as a rule. And that doesn't mean that it applies in every case because numerous courts have said, I'll say it, a number of courts have said that the jurisdictional immunity are broader than the exceptions to attachment immunity. That doesn't require courts to find that in every instance. And that there can't be exceptions to that. And here Congress drafted an exception. They said that a party that has been found liable and is obligated to pay will be forced to pay out of any commercial use property regardless of who uses it. And if Congress wanted to limit that to the foreign state itself, Congress would have said use by the foreign state as it does elsewhere in the Foreign Sovereign Immunities Act. I see the light is on. I want to save some time for rebuttal. That's fine. Should I stop here? Okay. That's fine. Mr. Schultz is first up. Thank you, Your Honor, and may it please the Court. Benjamin Schultz on behalf of the United States. The United States has participated in this case to address three issues of importance to the government. First, to explain that Section 1610G is not a freestanding attachment provision, and that instead its language, as provided in this section, incorporates the other requirements of 1610, including 1610A's commercial activity requirement. Second, the government has explained that this commercial activity requirement in 1610A requires use by the sovereign itself, not by some third party. And finally, the government has participated to explain that the Choga Mish assets are not blocked assets within the meaning of the Terrorism Risk Insurance Act. Addressing first the 1610G issue, as the Court already remarked, the key language here, which was not discussed in the Gates opinion, is as provided in this section. And the plaintiffs don't really have a good answer for what that language is doing in the statute. And we submit that the answer is clear, that it has to be that 1610G is not a freestanding provision, and that instead it's just saying that before, if you wanted to use 1610A or 1610B, you had to overcome the ban check presumptions. Now you no longer need to do so. But what it is not saying is that there is an entirely separate immunity provision that you can use to attach. Now the plaintiffs' oral argument here have suggested that the as-provided-in-this-section language would be inconsistent with Gates. That's wrong for two reasons. First, as the Court has already remarked, Gates never even addressed the as-provided-in-this-section language. That was a case in which two different sets of judgment creditors were fighting amongst each other. The United States hadn't even participated in that case. Was this case just not on your radar? I don't know if OFAC had been given notice of the case, and I don't know if DOJ had been given notice of the case. Certainly the 1610G issue is something that the government has participated in, and, indeed, there was a Ninth Circuit case. There's a pending Ninth Circuit case where the district court reached the 1610G issue, and we've participated to urge the Ninth Circuit to correct what we think is the district court's mistaken understanding of 1610G. Right, because the dual grounds for the decision in Gates, I mean, one of which clearly engages in a discussion of that issue about whether 1610G is an independent basis for attachment authority. You know, there's some perhaps loose language in Gates, but the second reason that I wanted to make sure the Court was on. Yes, I mean, we'd have a hard time describing it as that when the opinion talks about it as one of two independent reasons for the disposition. Well, Your Honor, I think what I mean by loose language is there may be language that suggests the idea that there's such a thing as a 1610G attachment, but the point that I want to make sure the Court understands is that this Court can conclude that 1610G is not a freestanding attachment provision, and it can do so without undermining Gates's conclusion that 1610C didn't apply in that case. Well, sure, because there's an alternative ground, but there's actually an additional reason, and the additional reason turns on the unique language of 1610C. So if you look at the language of 1610C, it talks about an attachment or execution referred to in subsections A and B of this subsection. That's important because the fact pattern of Gates was you had the judgment creditors of a foreign state trying to execute not against the assets of a foreign state, but against the assets of an agency or instrumentality of a foreign state. It was a central bank and then the state's phone system. So what you had was you did not have an asset execution that was described in subsection A, because subsection A is only about executing against the foreign state's assets when you have a judgment against a foreign state. And it also wasn't an asset execution described in subsection B, because subsection B deals with when you have a judgment against the agency or instrumentality, and you're executing against the assets of the agency or instrumentality. So this was neither an execution described in A, nor an execution described in B. Instead, it was an asset execution that properly understood was A as modified by the fact that G overrides the band check presumption, because that was the only way that the plaintiffs would have been able to get to the assets of the agency or instrumentality. So strictly speaking, what you could say is that subset... These were not Syrian bank accounts? They were not. They were the assets of the Syrian telephone system and the central bank of Syria. Now, there also might have been a 1611 problem, and nobody seems to have even considered that in the case. So there may be an additional reason why you couldn't have gotten the central bank assets. But even putting that aside, they were not bank accounts in Syria's name itself. They were agency or instrumentality assets, and that's why you needed 1610G to even have a chance at them. And so, you know, so even, again, so I think one way you could look at the outcome in Gates is you could say, yes, 28 U.S.C. 1610C is one of the things that gets incorporated by the as-provided-by-this-section language in 1610G. It just so happens that in the circumstance of the Gates case, C didn't apply on its own terms because the asset execution was neither one referred to in A nor referred to in B. I'd be happy to address any more questions the Court has about 1610G. Well, it would have to be in Gates an attachment pursuant to subsection A or B as modified by subsection G, which overrides the magic section. Right. So it would be an A or B attachment as modified by G. Well, that's exactly what we've got here, right? Well, no, Your Honor. Actually, these are not assets of an agency or instrumentality of Iran. The premise here was that you have assets. And even if that were true, Your Honor, even if one thought that these were the assets of an agency or instrumentality of Iran, that might then lead to the conclusion under Gates that C doesn't apply. But it doesn't. But that's, again, only because of the unique language of C. It doesn't mean that you don't have to satisfy the other requirements of A. I'd be happy to address more about 1610G if there are further questions. Otherwise, I'll move on to 1610A. And there, the question is the language used in commercial activity, whether or not that only applies to use in commercial activity by the sovereign or if it also includes use by the foreign sovereign. I'm sorry, or use by a third party. And we submit that it has to include use by the foreign sovereign. And the reason for that, first, comes from Section 1602, which is a codified statement of purpose of what Congress was trying to accomplish in the FSIA. And second, it comes from the general context of the statute itself, which has been recognized as being to codify the restrictive theory of sovereign immunity. And it would be a particularly odd conclusion to say that when Congress was waiving the executional immunity of a sovereign state, it was always understood to be more rigorous than the immunity that applies for jurisdictional immunity, that somehow Congress had inadvertently allowed third parties to weigh the sovereign state's immunity. And that's just we submit not a proper interpretation, and it would lead to odd results. If there are questions about 1610A, I'd be happy to address them. Otherwise, I'll move on to the blocked assets question. I see my time is up, but if the Court has... You can take a moment or two to state your position on that issue. Sure. And as to the blocked assets, I just want to make sure the Court understands that whether or not the Chogomysh collection is... The dispute about TRIA and the Chogomysh collection is now moot. It's not something the United States has taken a position on. But I just want to make sure the Court recognizes that the analysis that we provide as to how to interpret OFAC's regulations and the deference that OFAC receives in interpreting its regulations could well apply to the other assets in the case. And so we want to make sure that the Court has and looks at our views as to how those regulations work and should be interpreted. All right. Thank you, Mr. Schultz. Mr. Lampkin. Good morning, and may it please the Court. I wanted to make a few very quick points about 1610G, and then we'll move on to the commercial use exception. With respect to 1610G, the Court's already focused in on the as provided in language. But ignoring that language would also create a serious superfluity problem that the district court noticed. At the same time, Congress created that exception for creditors holding 1605A judgments. It also modified two terrorism exceptions to immunity, 1610A7 and 1610B3. Both of those were modified to make them available to people with 1605A judgments. Both require you to have that sort of judgment or another sort of terrorism judgment and show commercial activity. That change to make those provisions available to people with 1605A judgments would have been completely superfluous if 1610G were a freestanding waiver of immunity that allowed you to attach whatever assets there were for any terrorism judgment. No one would ever bother going through 1605A7 and showing both commercial use and a 1605A judgment or 1610B3 for the same purpose if you could just jump right to 1610G and get everything you wanted without showing commercial use. Second, I wanted to note that also 1610G has a peculiar feature in that unlike 1610A, B, C, D, E, it nowhere says the shall not be immune. Indeed, 1610G2, which is talking about the U.S. government's immunity, says shall not be immune. But 1610G1 doesn't have that language. But it has the same concept stated in positive terms. In other words, this property shall be subject to attachment. Yes, it says shall be subject to attachment as provided in the section regardless of certain factors. And that as provided in the section regardless of certain factors, if it's subject to it, you can attach it, as the section would allow, without having to jump through any BANCEC hoops, without having to worry about BANCEC. And that's why as provided in regardless of the BANCEC factors is sort of that key phrase that makes it clear what 1610G is all about. And to the extent it's ambiguous and one has to struggle with language, there is a rule of narrow construction for waivers of sovereign immunity. And that is because the courts should be very cheery about treading on things that could offend and could get into international relations. And saying that a sovereign's property is subject to execution and seizure is precisely one of those things. Right. The plaintiff's interpretation, as I understand it, would open up diplomatic property to attachment, which is hardly within the scope of what Congress intended, it seems to me, unless it would have said so much more clearly. One would have expected a very clear statement if Congress were going that far. And we don't have that sort of a clear statement here. And finally, with respect to Gates, the only comment I would make about Gates is that the issue as provided in this section regardless of just wasn't litigated by the parties, it wasn't brought to the court's attention, the court at most assumed a particular meaning for that provision. But under the Supreme Court's decision in Brecht v. Abramson, which is 507 U.S. 619, assumptions don't bind later panels because if the litigants don't do their job of apprising the courts of the issues, the courts can't be bound to assumptions inherent in the opinion. It's just not good judicial policy to do anything but read the court as having decided the issues that were litigated as opposed to assumptions that the party made. So turning back to 1610A, I wanted to point out first that there's an alternative ground that would allow the court to avoid deciding whose commercial use counts. And this was pointed out in section D of our brief, which is that regardless of whose use counts, here there was no commercial use by anybody. We made that point for three pages, pages 33 to 35, and there's no answer to it anywhere in the reply, simply ignored. That's a waiver. In this court's decision in Hardy City Optical, it said when an appellee advances an alternative ground for upholding a ruling and the appellant doesn't respond in his reply brief, he waives as a practical matter, any objections not obvious to the court. Second, here the uses were actually non-commercial. They were governmental. Because under this court's decision in Retro-Presbyterian, the nature of the objects makes a huge difference. Where the objects at issue are the sort of good or service in which only a sovereign can deal, the use is almost inherently non-commercial. It's inherently sovereign. And international law likewise recognizes that when you're talking about sovereign property forming part of the cultural heritage of the state, if it's not placed on sale, it's not used for commercial activity. And more fundamentally, there's simply no evidence here of anything that would amount to commercial activity by anybody. There's no display of the Persepolis collection, nobody charging admission to see it. That's undisputed fact number 26. If I could interrupt for a minute, though. Cultural property is often held by private parties. It's not inherently the property of the state. Yes. That's why in both instances the reference and the United Nations Convention is talking about cultural property owned by the government is something in which only the government can deal, and therefore the uses of that are non-commercial. And what matters here is what the artifact, how the artifacts themselves are used. And here they were put on display. Nobody charged admission for them. What happened with the objects is they were studied. They were studied to decipher ancient Elamite inscriptions, which is consistent with the Institute's scholarly mission, and Iran's cultural heritage. But studying ancient artifacts to understand ancient, long-forgotten languages and cuneiform inscriptions is simply they're not a sort of commercial activity in which a certain type of activity in which private parties typically engage to bet be in commerce or to make profits. And again, there's simply no response. So scholarly papers and photographs and books, et cetera, prepared from... I think that's absolutely right. And the key point is that it's scholarly publishing. And that sort of limited distribution scholarly publishing... Doesn't make money, is it? No. It's not the type of thing people do to engage in commerce. It's the type of thing that scholars do in order to disseminate information and better the world and better knowledge about ancient inscriptions. Nobody's going to be publishing ancient Elamite texts for profit or to engage in commerce. And I think that sort of scholarly function is... The State Department sort of recognized it as a critical piece of the analysis when before the FSIS enactment, it was applying the restrictive theory of immunity. There's a case called deep, deep ocean products versus USSR. There was a ship on the high seas that caused damage. And the State Department determined, well, you know, of course people in the private world do operate ships. That could be private. But this was on a scholarly mission for study, and that is inherently non-commercial. Any use like that would be highly attenuated. One doesn't actually use the objects themselves in the publication. They're sitting in the vault still. One might study and use the results of the study for the publication. But that's somewhat attenuated. If someone studied, for example, the Star-Spangled Banner, which is in the National Museum in Washington, and wrote a best-selling book about it, no one would say that the scholar, you know, used the Star-Spangled Banner, the flag itself, for commercial activity. He used his observations, perhaps. But one wouldn't say that he used it for commercial activity, and certainly one wouldn't take that further step and say, ah-ha, and as a result, we're now going to limit the United States' immunity and the immunity of that flag from execution by creditors. It just doesn't make sense. It's too far removed. But turning to the issue of by whom the use has to be, it's true that this is passive voice in some sense. But passive voice is often used, and in no case when it doesn't mean by everyone. And I can offer you a couple examples. The Constitution itself is a regular user of passive voice. But we know from context that it doesn't always mean by everybody. For example, the Eighth Amendment says, nor shall cruel and unusual punishments be inflicted. And we know that doesn't mean by anyone ever, like parents upon their children. We know from context that means cruel and unusual punishments shall not be inflicted by the government. Speech and debate clause says congressmen shall not be questioned in any other place for their floor statements. We know that doesn't mean they can't be questioned by anybody, including the press. We know it really means by law enforcement, by people trying to hold them responsible in the courts. It's oftentimes, depending on context, when you have passive voice, it very well mean by a limited set in context matters. And the Supreme Court's decision in Dean is another example. In the criminal context... I see my time has expired. You wrap up. In the criminal context it makes sense because if you behave in illegal conduct,  so it doesn't matter who used the gun. But when you're looking at sovereign immunity, the principle is when the sovereign engages in conduct, when the sovereign uses its objects for commercial activity to be like a private person and uses them like a private person would, then they may be treated like a private person's possessions. But if some private person uses the sovereign's objects, that shouldn't open it up to seizure and waive the sovereign's immunity. Thank you. Thank you. Mr. Ellison? Good morning, Your Honor. Good morning. May it please the Court, the museums argue here separately and very briefly with respect to the two other collections of artifacts that are not the property of Iran and therefore are not subject to attachment, irrespective of any of the contentions relating to the FSIA and TRIA. The Field Museum and the Oriental Institute each own part of what's referred to as the Herzfeld Collection, which is a series of artifacts that were purchased from a Professor Herzfeld in 1945. Additionally, the Oriental Institute owns what's referred to as the OI Collection, which is a series of Persian artifacts that were obtained through division or by gift over the last 75 years. Both of these collections have been owned by the museum without any competing claim or contest for decades. Appellants now claim that they really belong to Iran, despite the fact that Iran is, of record here, specifically disclaiming any interest or ownership in these collections. The plaintiff says that's strategic. Well, it may be strategic. They believe that, but it's of record here and thus binds Iran, so that if Iran were to later come and say, oh, we really do own those, they'd be bound by their admission here that they belong to the museums. And so there's no claim of record here that they own them, and the plaintiffs can't step into their shoes and say that they're owned by Iran in order to create the manufacture-tria contest that they want to make to try to say that they continue to be blocked. Well, and even setting that aside, it's my understanding that the claim of Iranian ownership depends upon some ambiguous circumstances about the supposedly nefarious provenance of this. That's exactly right. Their claim is essentially a negative claim that because the museums don't have a perfect chain of ownership from the ground in Iran to the museums, that they can't prove that they own it, and thus Iran owns it. And they can't prove ownership through negative implication. They have absolutely no evidence that these artifacts belong to Iran. And in fact, although the district court didn't reach ownership because it ruled that even if they were owned by Iran, the FSIA and TRIA arguments didn't apply, and thus it didn't have to deal with ownership, the museums argued in their appellate brief comprehensively that they indeed own the artifacts, and in reply the appellants were entirely silent. And silence in the face of factual contentions in an appellant's opposition brief is a waiver. Now even without waiver, though, there is absolutely no evidence that Iran owns these properties. The burden is on the plaintiff, and they've submitted absolutely no evidence to support their claim of ownership. That was very quick. You can wrap up if you have a concluding thought. No, here the appellants want to say they can't show that they own it, and therefore Iran owns it, and therefore it's still blocked. And that's much too tenuous a connection to make, and thank you very much. Thank you. All right, Mr. Perlin, you've got two minutes. Okay, I have a few quick points to make. There are two waiver arguments. In terms of the commercial use, the factual issue of commercial use, footnote 10 of our opening brief addressed it. We didn't waive it. In terms of the... Okay, I don't remember the other one that was waiver right now. Okay, avoiding... Discussing 1610A, the appellees avoid addressing the text of the statute itself, which is where the Supreme Court says the analysis should begin and end. They talk about 1602, which says it has the word their property, but if you read that to override the rest of the Foreign Cyberimmunities Act, you won't have a terrorism exception because it will only apply where you won't have... It's reading too much into it. It could still be addressing the property of a foreign sovereign even if it's not the use made by a foreign sovereign. We're saying that the property here was the property of the foreign sovereign, but it wasn't their use. Relying on the Eighth Amendment, the use of the passive voice in the Constitution, which was written over 230 years ago, if there's no more recent... It's still good law. It's still good law. But it's not the model for statutory drafting that we would use today. Neither is anything about this statute. I'm sorry. That's a very good point. 1610G is ambiguous, and there's no way to get a clean reading of it. There's surplufility. That's a word. No matter how you read it, it says any property. We have other courts saying it's meant to be read very broadly, and they should be followed. This court said it. The Ninth Circuit said it. The Southern District of California said it, and the District Court for the District of Columbia said it. They all say it should be read broadly to apply to all property. I say my time is up. All right. Thank you, Counsel. Thank you, Your Honor. Our thanks to all. Counsel, the case is taken under advisement.